**Baldwin Hardware Mfg. Co. v. Berks County Bd. of Assessment Appeals**

200

C.P. of Berks County, no. 09-15740.

*Joshua D. Baer*, for appellant.
*Edwin L. Stock,* for appellee.

LASH, *J.*, November 30, 2010—The appellant, Baldwin Hardware Mfg. Co. ("Baldwin"), has filed an appeal from the decision entered by the Berks County Board of Assessment appeals ("board") assessing real estate owned by Baldwin at three million three hundred fifty thousand seven hundred dollars ($3,350,700.00), effective January 1, 2010 for city and county taxes and July 1, 2010 for school taxes. A de novo trial was held on the appeal on November 8, 2010. The court enters the following findings of fact:

## I. FINDINGS OF FACT

1. Appellant, Baldwin Hardware Mfg. Co. ("Baldwin"), is a corporation, maintaining an address at 841 East Wyomissing Boulevard, Reading, Berks County, Pennsylvania 19611-1759.

2. Appellee, Berks County Board of Assessment Appeals ("board"), is located at the Berks County Services Center, Third Floor, 633 Court Street, Reading, Berks

County, Pennsylvania 19601.

3. Intervenor, Reading School District ("school district"), is a school district of the second class, having a principal office at 800 Washington Street, Reading, Berks County, Pennsylvania 19601-3691. School District filed its Notice of Intervention on December 30, 2009.

4. The property that is the subject of this assessment appeal is owned by Baldwin and is located at 841 East Wyomissing Boulevard, City of Reading, Reading School District, Berks County, Pennsylvania ("Property"), Parcel Identification Number 18-5306-10-45-3607.

5. The property is situated on 28.17 acres of land.

6. The property consists of twenty-six (26) major buildings and/or sections, containing a total of 293,198 square feet of gross building area, built at different times, from 1956 through 2001.

7. The land is zoned H-M, Heavy Manufacturing.

8. Baldwin uses the facilities on the property for manufacturing and warehousing, in the business of the manufacture of brass fixtures and other hardware.

9. The buildings used for manufacturing are interconnected, totaling 268,570 square feet on two (2) separate levels, connected by an underground tunnel. The upper portion of the manufacturing warehouse was constructed in 1956, 1963, 1965, and 1983. Portions of the lower plan area were constructed in the early 1960's and expanded in 1968 and 1986.

10. There is also a freestanding administrative office building with gross building area of nearly 25,000 square

feet.

11. The facility, having been constructed in several installments over a period of years, is eclectic, being in part concrete block, part brick, and part metal panel. The ceiling heights range from 16 feet to 26 feet, with a predominate ceiling height of approximately 16 feet 8 inches.

12. The property has been environmentally polluted. Baldwin had constructed on the site two (2) unlined surface impoundments used for storage of electroplating waste water sludge generated by Baldwin's manufacturing process. Environmental testing revealed that these impoundments were compromised, resulting in trichloroethylene (TCE) being found in on-site monitoring wells.

13. Sometime in 1987, Baldwin entered into a consent decree before the United States Environmental Protection Agency. The consent decree required remediation. Said remediation has been ongoing and continues to this day and is expected to continue for the foreseeable future. The costs for these remediation measures have been borne by Baldwin. Since the remediation efforts began, no new environmental pollution problems have been reported.

14. On or about July 30, 2009, Baldwin filed an appeal from its current assessment of three million four hundred seventy-three thousand one hundred dollars ($3,473,100.00) to the board.

15. After hearing held, the board issued a notice on October 30, 2009, establishing the assessment at three million three hundred fifty thousand seven hundred dollars ($3,350,700.00).

16. Baldwin filed a timely appeal to common pleas court.

17. The years in question for this appeal are 2010 and 2011. The Berks County common level ratio for tax year 2010 is .677 and for 2011 is .701.

## II. DISCUSSION

The issue before this court is the fair market value of the premises. Actual or market value is defined as "the price which a purchaser, willing but not obligated to buy, would pay an owner, willing but not obligated to sell, taking into consideration all issues to which the property is adapted and might in reason be applied." *F & M Schaeffer Brewing Company v. Lehigh County Board of Appeals*, 530 Pa. 451, 457, 610 A.2d 1, 3 (1992)(citation omitted).

In support of their respective positions, each party presented testimony by an appraiser expressing an opinion of fair market value. Baldwin's expert was Kevin B. Flynn, MAI, CCIM, of the Flynn Group, who valued the fair market value of the property, as of January 1, 2010, to be three million five hundred twenty-five thousand dollars ($3,525,000.00), if considered free and clear of environmental issues, and two million seven hundred thousand dollars ($2,700,000.00) as is. The board and school district jointly retained Thomas J. Bellairs, GRI, GAA, RAA, who found the fair market value of the property to be four million eight hundred thirty-five thousand dollars ($4,835,000.00) as of March 31, 2010.

The court's function is not to independently value the property, but to determine the value based on competent and credible evidence. *Appeal of F. W. Woolworth Company*, 426 Pa. 583, 586, 235 A. 2d 793, 795 (1967). When there are

conflicting experts, the court may accept all, none or part of an expert's testimony, part of one expert's testimony and part of another's. *Appeal of Avco Corporation*, 515 A.2d 335, 338 (Pa. Cmwlth. 1986). In determining actual value, three approaches to valuation are to be used: cost (reproduction over placement, as applicable, less depreciation in all forms of obsolescence), comparable sales, and the income approach. 72 P.S. §5020-402, 5348(d), *F & M Schaeffer Brewing Company*, 610 A.2d at 3. In considering the weight to be given to various approaches to valuation, a trial court has discretion to determine which of the conflicting methods (cost, comparable sales or capitalized income) is the fairest and most reasonable for a particular property. *Pennypack Woods Home Ownership Association v. Board of Revision of Taxes*, 639 A.2d 1302, 1303 (Pa.Cmwlth. 1994), *allocatur denied*, 539 Pa. 669, 652 A.2d 839 (1994).

Both appraisers relied solely on the comparable sales approach, finding both the income and cost approach to be impractical, requiring too much assumption and speculation to reach appropriate figures.

In reaching his opinion, Baldwin's appraiser conducted an onsite inspection on November 11, 2009, reviewed documentation received from Baldwin, including documentation regarding the environmental issues, performed a locational analysis and market overview, and searched for appropriate comparable properties in the immediate vicinity. He ultimately identified five (5) comparable properties, sold from February 2007 through February 2010, with two (2) properties being located in Berks County, one (1) in Chester County, one (1) in York County, and one (1) in Montgomery County. He then employed a quantitative analysis on the comparables, making adjustments

in percentages to account for features of the comparables that were superior or inferior to the property. From this analysis, he reached a determination that twelve dollars ($12.00) per square foot properly reflected fair market value for the property. Multiplying that figure by the square footage of the facility, he concludes that the fair market value, prior to deduction for environmental concerns, was three million five hundred twenty-five thousand dollars ($3,525,000.00).[1]

Comparable number 1 was a one (1) story, multi-building industrial complex, the former Alcoa plant in Chester County, sold in February 2010 for two million dollars ($2,000,000.00) to investors who planned to convert the building to multi-tenant use, requiring between two million dollars ($2,000,000.00) and three million dollars ($3,000,000.00) of renovations and upgrades. The building size is 200,999 square feet on 11.11 acres. The building was constructed in 1954 and 1965 with a ceiling clearance of between 16 feet and 22 feet. The price per square foot was nine dollars and ninety-five cents ($9.95). The only adjustment made by the appraiser was an upward adjustment of fifteen percent (15%) to account for the renovations contemplated, resulting in an adjusted sales price of eleven dollars and forty-four cents ($11.44) per square foot.

Comparable number 2 was a one (1) and part two (2) story industrial building located in York County, sold in February 2007. The building size was 191,000 square feet, set on 19.290 acres, being constructed in 1975 and the 1980's. The sale price was two million two hundred eighty thousand dollars ($2,280,000.00), representing eleven dollars and

---

1. Baldwin's appraiser's fair market value is based on a square foot figure of 293,450 feet. Based on a stipulation of the parties, this court employed a square foot figure of 293,198 square feet.

ninety-four fents ($11.94) per square foot. Ceiling clearance was 16 feet. This property also featured eight (8) tailgate loading doors and two (2) drive-in doors, features superior to the subject property. The appraiser initially adjusted downward ten percent (10%) for superior market conditions, then adjusted downward by five percent (5%) to account for the physical superiority, based on newer construction and the loading access system, and an additional five percent (5%) downward to account for the location. This resulted in an adjusted sales price per square foot of eleven dollars and eighty-two cents ($11.82).

Comparable number 3 is the former Tyco Electronic Corporation located in Berks County, Pennsylvania, in a similar neighborhood as the subject property. The building, a one (1) story, multi-building industrial complex, is much smaller than the subject property, being 89,448 square feet. Additionally, the complex is bifurcated by a street. The buildings are somewhat older than the subject property, being constructed in the 1940's, 1950's, and 1960's. The ceiling clearance is lower than the subject property, being 12 feet to 18 feet. The comparable was sold in May 2009 for one million two hundred fifty thousand dollars ($1,250,000.00) or thirteen dollars and ninety-seven cents ($13.97) per square foot. The appraiser adjusted upward five percent (5%) to account for the less desirable zoning of the comparable and adjusted downward fifteen percent (15%) because of the smaller size of the property. The appraiser did not adjust for age or physical condition. The adjusted sale price was twelve dollars and fifty-eight cents ($12.58) per square foot.

The fourth comparable was a one (1) and part two (2) story industrial building located in Montgomery County and purchased by Allentown Refrigerated Terminals in

August 2008 for three million seven hundred ninety-six thousand three hundred fifty dollars ($3,796,350.00), or fourteen dollars and sixty cents ($14.60) per square foot. The facility is 260,000 square feet with 80,000 (30.8%) being refrigerated space. The ceiling clearance is somewhat lower at 12 feet to 19 feet. The building was constructed in 1956 and renovated in the early 1990's and includes fifteen (15) tailgate loading doors and one (1) drive-in door. The appraiser initially adjusted downward by five percent (5%) for superior market conditions, then downward five percent (5%) for superior physical conditions, and downward by ten percent (10%) due to the refrigeration capacity, resulting in an adjusted selling price of eleven dollars and seventy-nine cents ($11.79) per square foot.

Comparable number 5 is a one (1) and part two (2) story industrial facility located in Leesport, Berks County, Pennsylvania, sold on August 2008 for four million five hundred thousand dollars ($4,500,000.00), or eighteen dollars and ninety-eight cents ($18.98) per square foot. It is somewhat smaller than the subject property, being 237,038 square feet, and setting on 22.66 acres. There is 40,060 square feet (16.9%) of office space. The construction is newer than the subject property, being constructed in 1967, with additional construction in the 1970's and 1980's. The comparable is rectangular, more uniform, and therefore, more attractive to a prospective buyer than is the subject property. The appraiser adjusted downward by five percent (5%) for market considerations, then five percent (5%) downward due to the newer construction, five percent (5%) downward because of its location being closer to a highway than the subject property, and ten percent (10%) downward for physical characteristics, including the superior quality of

the physical condition, and the rectangular appearance, five percent (5%) for the level of interior finish and five percent (5%) for other functional features, resulting in an adjusted selling price per square foot of twelve dollars and sixty-two cents ($12.62).

Reviewing the adjusted selling price per square foot of the comparables, all of which were between eleven dollars and forty-four cents ($11.44) and twelve dollars and sixty-two cents ($12.62), Baldwin's appraiser opined that the proper value would be twelve dollars ($12.00) per square foot, resulting in his fair market value figure of three million five hundred twenty-five thousand dollars ($3,525,000.00).

Baldwin's adjuster then considered the environmental pollution which he believes will adversely impact fair market value. He obtained past remediation costs incurred by Baldwin, including an initial outlay of one million two hundred sixty-four thousand two hundred forty-four dollars ($1,264,244.00) followed by the continuing samplings, analyses, technical review, report generation, energy to run the process and pump replacement and administrative costs. From these costs, Baldwin's appraiser projected what the continuing costs would be going forward, costs which would be incurred by a buyer assuming the remediation upon purchase, stating:

> As of the date of valuation, TCE levels continue to exceed acceptable levels. For purposes of our analysis, we have assumed that the existing remediation, testing, monitoring and reporting requirements will continue for an additional 10 years from the January 1, 2010 date of valuation. Going forward, annual expenditures for sampling, analysis, technical review, energy charges required to operate the

pumps, equipment maintenance repairs/replacements and administrative costs, can be anticipated.

From 2000 through 2008 annual expenditure for sampling, analysis, technical review and reporting requirements ranged from $32,860 to $40,340 and the average annual expenditure was $37, 074. We have of [sic] assumed that in 2010 the annual expenditure would be $38,000, and increase 2% annually thereafter.

From 2000 through 2008 annual expenditure for electricity to operate the remediation pumps reportedly totaled $17,000 per year. We have of [sic] assumed that in 2010 the annual expenditure would be $17,000. However, beginning January 2011 rate caps for electricity charges in Pennsylvania expire and increases for non-residential uses of between 20% and 40% are anticipated. For purposes of this analysis, we have assumed electricity rates will increase by 20% or $20,400 per year beginning in calendar year 2011 and increasing 3% annually thereafter.

Annual expenditure for pump maintenance/replacement ranged from $0 to $17,419 from 2000 through 2008. The average annual expenditure was $3,328. We have of [sic] assumed that in 2010 the annual expenditure would be $3,400, and increase 2% per year each of the following years.

Lastly, from 2000 through 2008 administrative expenditure ranged from $5,020 to $6,430 and averaged $5,765. We have assumed that the annual expenditure for administrative costs in 2010 to be $5,800 with an annual increase of 3.5% increase thereafter.

...we have calculated the present worth of the anticipated

annual expenditures for ongoing remediation expenses at a 9% discount factor to be $469,670 which has been rounded upward slightly to $475,000.

The Flynn Group real estate appraisal report, p. 37.

The appraiser determined that a discount based on the effects of "stigma" on market value was also appropriate. He notes that real estate that has been affected by environmental pollution, whether remediated or in the process of being remediated, is stigmatized, such that prospective buyers are less inclined to embrace purchase of such a property. He concedes that the stigma may not be as substantial when dealing with an industrial property, particularly when the contamination is underground, nevertheless, he believes that a segment of the market will not buy, at any price, a property that has been contaminated, even with guarantees or indemnification provided by the seller. He estimates an appropriate deduction for the stigma is ten percent (10%) from the original estimate of fair market value of three million five hundred twenty-five thousand dollars ($3,525,000.00). He rounds this figure off to three hundred fifty thousand dollars ($350,000.00). Subtracting four hundred seventy-five thousand dollars ($475,000.00) for anticipated remedial costs and three hundred fifty thousand dollars ($350,000.00) for stigma from the initial figure of three million five hundred twenty-five thousand dollars ($3,525,000.00), the appraiser estimates fair market value in an "as is" condition, as of January 1, 2010, to be two million seven hundred thousand dollars ($2,700,000.00).

The school district's appraiser also conducted an inspection of the subject property, one on May 7, 2008 and another on March 31, 2010, also reviewing data and then

performed research on obtaining comparable sales. He identified seven (7) comparables, all found in Berks County, with the exception of comparable number 5, which is located in Orwigsburg, Schuylkill County, close to the Berks County line. The school district's appraiser also used a quantitative percentage adjustment. After determining that the average adjusted price per square foot for the comparables would be sixteen dollars and forty-six cents ($16.46),[2] he concluded the price per square foot for the subject property would be sixteen dollars and fifty cents ($16.50).

The school district's appraiser also found that a discount is warranted due to the environmental pollution.

His method for factoring in the discount was different from Baldwin's adjuster, however, as he applied a five percent (5%) downward adjustment to all the comparables, thereby affecting each comparable's adjusted price per square foot. His conclusion was not based on an independent review of continuing remediation costs, but instead was a reliance on a previous finding made by Berks County Court on a 2000 assessment appeal of the subject property.

That decision, entered April 12, 2000 by the Honorable Jeffrey K. Sprecher, provided, among other things:

---

2. In his testimony, the school district's appraiser conceded that his data on the square foot size for comparable number 3 of 54,309 square feet was incorrect. He subsequently measured a portion of the property himself and found that the square footage for the facility would be roughly 72,000 feet. This changed the price per square foot for the comparable from twenty-three dollars and two cents ($23.02) to thirteen dollars and ninety-seven cents ($13.97), resulting in a new adjusted price of thirteen dollars and ninety-two cents ($13.92). This would also affect the average adjusted price for the comparables, reducing that figure to fifteen dollars and ninety-eight cents ($15.98) per square foot. In his testimony, the appraiser stated that this modification would not change his opinion that fair market value would be sixteen dollars and fifty cents ($16.50) per square foot.

30. The comparable sales offered by Mr. Haring are credible and persuasive. However, the adjustments calculated by Mr. Haring do not sufficiently account for the negative features of the subject property. Mr. Haring underestimated the environmental, topographical, and structural problems. Mr. Haring estimated that the subject property has a value of $15.00 per square foot of building area. This court reduced Mr. Hiring's estimated value by 10% for the topographical and structural problems and 5% for the environmental problems at the subject property. Reducing $15.00 by 15% renders a value of $12.75 per square foot of building area.[3]

School district's appraiser's comparable number 1 was an industrial/warehouse facility located in the city of reading, Berks County, Pennsylvania, sold on November 9, 2006[4] for one million three hundred thousand dollars ($1,300,000.00). This facility was much smaller than the subject property, being 58,012 square feet, located on 4.009 acres, resulting in a price per square foot of twenty-two dollars and forty-one cents ($22.41).

He then adjusted downward ten percent (10%) due to the superior market conditions and twenty percent (20%) for the square footage and adjusted upward five percent (5%) because part of the acreage is located in a flood plain. With the five percent (5%) downward environmental adjustment, the total adjustment was thirty percent (30%), resulting in

---

3. Court of Common Pleas of Berks County, Docket No. 98-12882.

4. In his comparable sale grid on page 29, the appraiser identifies the date of sale as November 9, 2009. Because he made a ten percent (10%) downward adjustment due to superior market conditions, existing prior to 2008, it appears that the 2006 figure is accurate and the 2009 figure is a typographical error.

an adjusted square footage of fifteen dollars and sixty-eight cents ($15.68).

Comparable number 2 is an industrial/warehouse facility located in Boyertown, Berks County, Pennsylvania. The property sold on June 6, 2007 for one million three hundred thousand dollars ($1,300,000.00). The facility is 84,525 square feet set on 6.809 acres, resulting in a price per square foot of fifteen dollars and thirty-eight cents ($15.38). The appraiser made a downward adjustment of ten percent (10%) for superior market conditions, a downward adjustment of fifteen percent (15%) based on the size of the property and the five percent (5%) environmental adjustment, resulting in a thirty percent (30%) downward adjustment and a resulting adjusted price per square foot of ten dollars and seventy-seven cents ($10.77).

Comparable number 3 is an industrial/warehouse facility located in Exeter Township, formerly owned by Tyco, a comparable also identified by Baldwin's adjuster. The property was sold on May 7, 2009 for a sale price of one million two hundred fifty thousand dollars ($1,250,000.00). Based on the school district's appraiser's modified figure of 72,000 square feet, the price per square foot was seventeen dollars and forty cents ($17.40). There was a fifteen percent (15%) downward adjustment for building size[5] and a five percent (5%) environmental adjustment, resulting in a total adjustment of twenty percent (20%). This results in a adjusted price per square foot of thirteen dollars and ninety-two cents ($13.92).

---

5. Initially, the building size adjustment was twenty percent (20%) but based on the incorrect square footage, the adjustment was modified downward by fifteen percent (15%).

Comparable number 4 is located in the Borough of Hamburg, Berks County, and is a manufacturing/warehouse facility sold on March 13, 2009 for three million thirty-seven thousand five hundred dollars ($3,037,500.00). The facility is 151,160 square feet on a lot size of 49.05 acres, resulting in a price per square foot of twenty dollars and nine cents ($20.09). The appraiser made a downward adjustment of ten percent (10%) for superior location, downward ten percent (10%) for the smaller building size, and downward five percent (5%) for environmental concerns. There was an upward adjustment of ten percent (10%) based on the appraiser's assessment that the comparable facility was inferior. This resulted in a total adjustment downward of twenty-five percent (25%) and an adjusted price per square foot of fifteen dollars and seven cents ($15.07).

Comparable number 5 is a brick manufacturing building located in Orwigsburg, Schuylkill County. The property sold in January 2007 for three million seventy-three thousand eight hundred seventy-five dollars ($3,073,875.00) or twenty dollars and twenty-six cents ($20.26) per square foot. The building area is 151,740 square feet on a lot of 92.2 acres. The appraiser adjusted ten percent (10%) downward due to the superior market at the time of sale, ten percent (10%) downward for lot size, ten percent (10%) downward for the smaller building, and five percent (5%) downward for environmental concerns, resulting in a total adjustment of thirty-five percent (35%) and an adjusted price per square foot of thirteen dollars and seventeen cents ($13.17).

Comparable number 6 is a multi-tenant industrial

complex located in Muhlenberg Township, Berks County. The property was sold in June of 2006 for twelve million two hundred thousand dollars ($12,200,000.00) or thirty-two dollars and thirty-eight cents ($32.38) per square foot. The building area is 328,000 square feet on 32.46 acres. The appraiser adjusted ten percent (10%) downward due to the superior market conditions at the time of sale and downward ten percent (10%) for superior location. With the five percent (5%) adjustment for environmental concerns, the total adjustment was twenty-five percent (25%) downward, for an adjusted sale price of twenty-four dollars and twenty-nine cents ($24.29). We note that there was no adjustments made because the property was a multi-tenant facility.

Comparable number 7 was an industrial/warehouse facility located in St. Lawrence Borough, Berks County, Pennsylvania. It was sold on December 4, 2008 for three million six hundred fifty thousand dollars ($3,650,000.00). The facility is 144,517 square feet, located on 13.472 acres, resulting in a price per square foot of twenty-five dollars and twenty-five cents ($25.25). The appraiser adjusted downward ten percent (10%) for the superior market conditions at time of sale, ten percent (10%) for the smaller building size, and five percent (5%) for environmental concerns, resulting in a downward adjustment of twenty-five percent (25%), for an adjusted sales price per square foot of eighteen dollars and ninety-four cents ($18.94).

This court's analysis requires several preliminary observations. First, as stated, the two (2) appraisers took different approaches in factoring for the adverse environmental impact. To facilitate the comparison of these two (2) approaches, this court chose to adopt the

approach employed by Baldwin's appraiser, requiring therefore a conversion of the school district's appraiser's approach. To accomplish this, the court initially removed the downward adjustment for environmental impact in school district's comparables, enabling those comparables to then be considered on the question of fair market value exclusive of the environmental impact. After so determining fair market value, this court then discounted for the impact.

Secondly, as stated, both appraisers identified the former Tyco property as an appropriate comparable. However, the appraisers provided different square footage figures for the facility. School district's appraiser conceded that the original figure he provided of 54,309 square feet was incorrect, in that he failed to consider a second building. He then measured a portion of the facility himself and opined that 72,000 square feet was an appropriate figure. Baldwin's appraiser relied on data supplied from documents relative to the sale of the property, data which appears to be based on a stronger foundation. Accordingly, we accept Baldwin's appraiser's figures. Further, we accept Baldwin's appraiser's adjustments as being credible, his downward adjustments being more conservative, and actually resulting in a higher price per square foot, than if school district's appraiser's adjustments are used. Therefore, we accept the adjusted figure of twelve dollars and fifty-eight cents ($12.58) for Baldwin's comparable number 3 and school district's comparable number 3.

Third, school district's appraiser objected to some of Baldwin's comparables, arguing that they could not properly be compared to the subject property because of their location, being from different counties. We disagree.

In properties such as the subject property, location is important on matters such as proximity to a highway, zoning, and nature of the surrounding neighborhood, but geographic proximity of a comparable to the subject property is not as crucial as it might be for a residence or other type of commercial property. In other words, it does not appear that a prospective buyer of a facility like the subject property would be too concerned whether the property he is looking to purchase is located in Berks County, Chester County, or some other surrounding county, so long as the features the buyer is looking for are present. We find that fair market value for this type of property is not substantially affected by its geographic location within a multi-county region.

We find that all five (5) comparables submitted by Baldwin's appraiser are appropriate. Likewise, we find that the first five (5) comparables submitted by school district's appraiser are appropriate. School district's comparable number 6, a Muhlenberg Township property, is a multi-tenant industrial facility with data difficult to compare to the other comparables or to the subject property. As such, the use of comparable number 6 skewed the median price per square foot upwards beyond what was appropriate. Likewise, comparable number 7, the St. Lawrence property, being used as an operation and distribution center by Goodwill, appears to be more of a warehouse facility, a property that may be more easily marketed and sold than the subject property, which has substantial limitations and would be difficult to convert to multi-tenant or warehouse use. For these reasons, school district's comparables numbers 6 and 7 were not considered.

Adjusting the price per square foot of the five (5) remaining school district comparables to remove the environmental downward adjustment, the new adjusted prices per square foot are sixteen dollars and eighty cents ($16.80) for comparable number 1, eleven dollars and fifty-four cents ($11.54) for comparable number 2, twelve dollars and fifty-eight cents ($12.58) for comparable number 3, sixteen dollars and seven cents ($16.07) for comparable number 4, and fourteen dollars and eighteen cents ($14.18) for comparable number 5, resulting in a median price per square foot of fourteen dollars and twenty-three cents ($14.23). This figure appears to be in line with the figure of twelve dollars ($12.00) per square foot provided by Baldwin's adjuster. As this court cannot identify any other basis for preferring one appraiser's choice of comparables or adjustments over the other, we determine that the appropriate price per square foot, exclusive of environmental concerns, is thirteen dollars ($13.00). Multiplying thirteen dollars ($13.00) by the square foot figure of 293,198, we reach a fair market value of three million eight hundred eleven thousand five hundred seventy-four dollars ($3,811,574.00).

We turn then to the remaining issue, ascertaining an appropriate discount on fair market value to account for the environmental concerns. As stated, school district's appraiser urges that this court must accept a figure of five percent (5%) of fair market value, being bound by the ruling issued by Judge Sprecher in the 2000 assessment appeal of the property on the basis of coordinate jurisdiction or collateral estoppel. However, in this case, the effect of the environmental concerns on fair market value

must be from a 2010 perspective. There is more data and a longer record of the process and a probable better ability to project remedial costs into the future. While we acknowledge that the yearly costs have remained somewhat constant, this alone cannot be a basis for accepting the five percent (5%) figure, considering all the variables.

Additionally, overall factors affecting fair market value, which would impact on any adjustment for pollution in 2010, are very different from the factors germane to an assessment conducted in 2000. For example, market factors have changed. Both appraisers acknowledge this, finding it necessary to adjust fair market value for any comparable sales they identified which took place more than two (2) years prior to the 2010 appeal. Secondly, the condition of the property has changed, and in fact, there were some renovations performed in 2001.

Most importantly, the five percent (5%) deduction found by Judge Sprecher was a factual determination, not a legal one. This is an important distinction, as the matter before us is a de novo appeal, requiring an assessment of the Property for calendar years 2010 and 2011. As such, the action is an independent action, separate from the 2000 appeal, requiring that new evidence be taken and a ruling be issued based on the facts and circumstances adduced. It would be improper to accept Judge Sprecher's factual findings as our own, in the same sense as it would be improper for us to make our findings from the record developed at Judge Sprecher's trial. Accordingly, we find that this court is not bound by the prior decision.

Unfortunately, school district's appraiser did not

provide any independent analysis on the impact of the environmental concerns to fair market value, relying solely on Judge Sprecher's previous decision. Accordingly, in reaching an appropriate discount, our only guidance comes from Baldwin's appraiser.

As stated, Baldwin's appraiser first factored in continuing remediation costs, opining that a prospective buyer would insist that Baldwin assume these costs for the time they continued to exist, estimated to be ten (10) years. A buyer would therefore have to consider whether it intends to retain ownership of the property for at least ten (10) years, and if so, whether the remediation process would terminate on or before that time,[6] in essence, gambling that the discount would be sufficient, or perhaps even an overcompensation for the cost outlay a buyer would incur over time.

The propriety of this analysis must also take into consideration the buyer's intended use for the property. A buyer who intends to convert the property into a multi-tenant use would likely be very concerned about the continued existence of environmental problems and the costs for remediation. Since the current condition of the property is only fair and the costs to retrofit for multi-tenant use would be substantial, it appears the property would be unattractive to a buyer seeking to rent to several tenants. On the other hand, a manufacturer, seeking an inexpensive property, might be more willing to take on this property and its issues, including the environmental issue. For these reasons, it is

6. The consent order issued by the Environmental Protection Agency permits discontinuance on several bases, including EPA approval or the reduction of TCE concentration to or below the cleanup level for twelve (12) consecutive months.

more than likely that a buyer for this property would be an owner/operator, either purchasing the business from Baldwin and continuing with the same line of production, or doing some type of similar production, maintaining the property in a manufacturing capacity. Further, the owner would likely be planning to continue ownership of the property for an extended period of time. The offering of a discount on the sales price in the form of requiring Baldwin to pay the equivalent of ten (10) years worth of costs of remediation may be attractive, particularly if it appears that the remediation could be ended in less time. Also, considering the length of time that the property has been in remediation, it appears that the ten (10) year figure would be appropriate. We accept Baldwin's appraiser's conclusion.

We also agree with his figure for the ten (10) year payout of four hundred seventy-five thousand dollars ($475,000.00). These figures are based on remediation costs experienced by Baldwin over the course of the remediation since it began in 1987 or 1988. The costs have been remarkably consistent, particularly over the last ten (10) years, appearing to provide adequate data to make responsible projections. As this data is primarily based on actual figures provided by Baldwin and there was no data or other evidence provided by school district's appraiser sufficient to call the figures into question,[7] the data is deemed reliable and the figure of

---

7. School district's appraiser attacked the validity of the energy costs, pointing out that a figure of seventeen thousand dollars ($17,000.00) was set forth for energy for every year from 1988 through 2009, providing a different cost of eighteen thousand five hundred thirty dollars ($18,530.00) for 2010. The fact that the figure is identical for all of these years only establishes that the figure is an estimate, not an actual figure. It is likely that actual figures were not available because the energy costs for the environmental remediation were subsumed within the energy costs for the entire operation and could not be broken out. In

four hundred seventy-five thousand dollars ($475,000.00) shall be deducted from fair market value, in accordance with Baldwin's appraiser's method.

As we also previously noted, Baldwin's appraiser provided a ten percent (10%) discount for stigmatization. We believe this figure to be high. Assuming the continuing remediation costs are adequately addressed with the four hundred seventy-five thousand dollars ($475,000.00), and assuming that the prospective buyer would be an owner-operator which, as stated, appears to be the case, the concerns regarding stigma, while they do exist, are not that substantial to require a ten percent (10%) reduction on fair market value. While a buyer would certainly rather purchase a "clean" property and avoid the environmental issue altogether, it does not appear that the value for stigma should exceed five percent (5%), net after deduction of the four hundred seventy-five thousand dollars ($475,000.00). Accordingly, after subtracting four hundred seventy-five thousand dollars ($475,000.00) from three million eight hundred eleven thousand five hundred seventy-four dollars ($3,811,574.00), arriving at a net figure of three million three hundred thirty-six thousand five hundred seventy-four dollars ($3,336,574.00), we adjust further with a five percent (5%) discount of one hundred sixty-six thousand eight hundred twenty-eight dollars and seventy cents ($166,828.70), arriving at a net fair market value of three million one hundred sixty-nine thousand seven hundred forty-five dollars and thirty cents ($3,169,745.30), rounded

---

any event, the costs of seventeen thousand dollars ($17,000.00) per year for energy to run the environmental operation appears reasonable and was not otherwise challenged by the school district's appraiser.

off to three million one hundred seventy thousand dollars ($3,170,000.00).

We enter the following order:

## ORDER

And now, November, 30 2010, upon consideration of the within appeal and after a de novo trial held, it is ordered that the actual market value of the property owned by appellant, Baldwin Hardware Mfg. Co., and situated in the Reading School District, with an address of 841 East Wyomissing Boulevard, City of Reading, Berks County, Pennsylvania 19611-1759, Parcel Identification Number 18-5306-10-45-3607, is set at three million one hundred seventy thousand dollars ($3,170,000.00) for calendar years 2010 and 2011. Applying the common level ratio of .677 for 2010, the assessed value for tax year beginning January 1, 2010 for county and township taxes and beginning July 1, 2010 for school district taxes is two million one hundred forty-six thousand ninety dollars ($2,146,090.00). The common level ratio for tax year 2011 being .701, the assessed value for tax year beginning January 1, 2011 for county and township taxes and beginning July 1, 2011 for school district taxes is two million two hundred twenty-two thousand one hundred seventy dollars ($2,222,170.00).